**SHOOK, HARDY & BACON L.L.P.**
Matthew G. Ball (SBN 208881)
mgball@shb.com
Russell Taylor (SBN 345844)
rtaylor@shb.com
Moneer Mujaddidi (SBN 364707)
mmujaddidi@shb.com
555 Mission Street, Suite 2300
San Francisco, California 94105
Telephone:    415.544.1900
Facsimile:    415.391.0281

Attorneys for Plaintiffs
 COALITION FOR HUMANE IMMIGRANT
RIGHTS and LEGAL SERVICES FOR
CHILDREN

**SHOOK, HARDY & BACON L.L.P.**
Steven B. Weisburd (SBN 171490)
sweisburd@shb.com
Nykeemah C. McClendon (SBN 322544)
nmcclendon@shb.com
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone:    424.285.8330
Facsimile:    424.204.9093

Attorneys for Plaintiffs
 COALITION FOR HUMANE IMMIGRANT
RIGHTS and LEGAL SERVICES FOR
CHILDREN

**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA**
Jacob Gonzalez (SBN 368061)
jgonzalez@lccrsf.org
Jordan Wells (SBN 326491)
jwells@lccrsf.org
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone:    415.543.9444 ext. 226

Attorneys for Plaintiffs
 COALITION FOR HUMANE IMMIGRANT
RIGHTS and LEGAL SERVICES FOR
CHILDREN

**COALITION FOR HUMANE
IMMIGRANT RIGHTS**
CARL BERGQUIST (*pro hac vice pending*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: 310.279.6025
ADAM REESE (SBN 362898)
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Telephone: 213.353.1333

Attorneys for Plaintiff
 COALITION FOR HUMANE IMMIGRANT
RIGHTS

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS ("CHIRLA"), a California nonprofit organization; and LEGAL SERVICES FOR CHILDREN ("LSC"), a California nonprofit organization, <br><br> Plaintiffs, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CITIZENSHIP AND IMMIGRATION SERVICES <br><br> Defendants. | Case No. 3:26-cv-07577 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. This lawsuit challenges the Department of Homeland Security's unilateral and unlawful decision to deny indigent youth the chance to ask for a fee waiver when applying for Special Immigrant Juvenile Status ("SIJS")—a humanitarian protection created by a bipartisan Congress to ensure a path to lawful permanent residence for immigrant children who have been abused, neglected, or abandoned by their parents. *See* 8 U.S.C. § 1101(a)(27)(J).

2. SIJS is not an ordinary immigration benefit. It is an extraordinarily protective remedy designed to fit the vulnerability of its intended recipients. For over 30 years, SIJS applicants were categorically exempt from application fees, whereas other applicants for immigration benefits were required to demonstrate an inability to pay in order to obtain a fee waiver. Last summer, the One Big Beautiful Bill Act ("OBBBA" or "H.R. 1") imposed a range of new immigration application fees, including a $250 SIJS application fee. But whereas Congress expressly barred fee waivers under nearly a dozen neighboring immigration-benefit provisions enacted in the very same legislation, it deliberately refused to do so for the SIJS fee. Indeed, the House-passed version of the legislation expressly included a clause banning fee waivers for SIJS petitions, but the Senate removed it before the bill became law. In the teeth of this policy choice, U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS"), nevertheless declared that the SIJS fee is categorically non-waivable regardless of indigency, unlawfully resurrecting the very fee-waiver ban Congress considered and rejected. *See* USCIS Immigration Fees Required by HR-1 Reconciliation Bill, 90 Fed. Reg. 34,511 (July 22, 2025) (the "Fee Notice").

3. Many SIJS-eligible children have no lawful means of earning income, no parent or family whose resources they can draw on, and no way to assemble $250. The ban on fee waivers forces these children, or charities aiding them, to try to come up with the money—often under the time pressure of a statutory deadline to apply before the young person turns twenty-one years old. USCIS refuses to process a SIJS petition unless the fee is paid, so a would-be petitioner who cannot pay before "aging out" loses SIJS eligibility forever.

///

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: 3:26-cv-07577

4.    Pursuant to their longstanding missions, Plaintiffs Legal Services for Children ("LSC") and Coalition for Humane Immigrant Rights ("CHIRLA") seek to ensure that SIJS-eligible immigrant youth apply for and obtain SIJS. Their central claim is straightforward: H.R. 1 provides no lawful basis to categorically deny fee waivers for SIJS. Section 1805 of Title 8 generally requires the collection of a fee but says nothing about fee waivers. USCIS and its predecessor agency have maintained a broadly applicable, inability-to-pay-based fee-waiver framework for decades. *See* 8 C.F.R. § 103.7(c)(1) (1986); *Ayuda, Inc. v. Att'y Gen.*, 661 F. Supp. 33, 35 (D.D.C. 1987) (rejecting a challenge to increased immigration fees because agency regulations "excuse the requirement to pay in the event the alien certifies inability to pay" and crediting the government's representation that it would proceed with "liberal exercise of this waiver provision"), *aff'd sub nom. Ayuda, Inc. v. Att'y Gen.*, 848 F.2d 1297 (D.C. Cir. 1988). Congress legislated against that longstanding generally applicable, inability-to-pay-based fee-waiver backdrop when it passed the SIJS-fee provision of H.R. 1, and nothing in the statute's text displaces it. Indeed, Congress *expressly* prohibited fee waivers in numerous other immigration-fee provisions enacted in H.R. 1, as codified in neighboring provisions. *See, e.g.*, 8 U.S.C. §§ 1802(e), 1803(a)(5), 1803(b)(5), 1803(c)(5), 1804(f), 1806(a)(5), 1807(d), 1808(d), 1809(d), 1810(d), 1811(d). Congress's deliberate prohibitions of fee waivers in nearly a dozen other immigration-fee provisions contained in the same legislation passed at the same time as § 1805 foreclose Defendants' asserted basis for categorically denying fee waivers to SIJS petitioners. As to SIJS, Congress did not displace USCIS's longstanding fee-waiver authority. Therefore, USCIS's categorical no-waiver rule must be set aside.

5.    USCIS's bar on SIJS petition fee waivers should be set aside as unlawful for at least two reasons. First, it is arbitrary and capricious under the Administrative Procedure Act ("APA"). USCIS's Fee Notice acknowledges that § 1805 lacks a no-waiver provision but, without any reasoned explanation or consideration of relevant interests, nevertheless declares that H.R. 1 prohibits waivers for the SIJS application fee. Second and independently, USCIS failed to follow the notice-and-comment rulemaking procedure required by the APA for binding, substantive rules such as the one at issue here.

///

3

6.      Plaintiffs seek an order setting aside the bar on fee waivers for SIJS applications. Vacating the bar will require USCIS to consider afresh whether to accept and adjudicate SIJS fee-waiver requests under the agency's generally applicable fee-waiver framework, under which inability to pay may be shown by receipt of a means-tested benefit, household income at or below 150 percent of the Federal Poverty Guidelines, or extreme financial hardship. 8 C.F.R. § 106.3(a)(1)(i)-(iii). Once the agency's erroneous interpretation of H.R. 1 is set aside, decades-long agency practice and the text, structure, and history of H.R. 1 point to the only logical conclusion: that SIJS petitions should be among the fees that USCIS waives based on inability to pay.

7.      Because Defendants' no-waiver policy is a final agency action that is arbitrary and capricious and not in accordance with law, and was adopted without observance of procedure required by law, it must be held unlawful and set aside. 5 U.S.C. § 706(2)(A), (D). Plaintiffs therefore bring this action for declaratory and injunctive relief under the APA.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question). The APA, 5 U.S.C. § 702, waives sovereign immunity for claims seeking relief other than money damages. Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202.

9.      Venue is proper in this District under 28 U.S.C. § 1391(e)(1). This is a civil action against officers and agencies of the United States sued in their official capacities; no real property is involved; and Plaintiff LSC resides in this District because it is headquartered in San Francisco, California. Venue is also proper because Defendants' categorical fee-waiver ban injures LSC's legal-services operations and both CHIRLA's and LSC's SIJS clients in this District.

10.      This action is timely under 28 U.S.C. § 2401(a). The challenged policy was announced on July 22, 2025, and continues to injure Plaintiffs themselves, as well as their members and clients, by requiring payment of a non-waivable SIJS fee as a condition of filing. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 804 (2024) (APA claim accrues when plaintiff is injured by final agency action, not when agency action is promulgated).

///

///

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: 3:26-cv-07577

## PARTIES

11. Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit legal-services and advocacy organization headquartered in Los Angeles, California. Founded in 1986, CHIRLA is one of the largest and most established immigrant-rights organizations in California. CHIRLA is a membership organization composed of diverse immigrant families and individuals who participate in CHIRLA's programs, receive its legal services, and engage in collective advocacy. CHIRLA's mission is to achieve a just society fully inclusive of immigrants by organizing and serving individuals, institutions, and coalitions to build power, transform public opinion, and change policies to achieve full human, civil, and labor rights.

12. CHIRLA operates a legal services department providing free immigration legal services across California, including direct representation, consultations, know-your-rights sessions, and community education. CHIRLA's legal services include asylum, DACA renewals, family-based immigration, naturalization, and deportation defense. CHIRLA serves SIJS-eligible youth through (1) direct legal representation in state juvenile and family courts to obtain predicate orders, (2) preparation and filing of Form I-360 petitions with USCIS, and (3) advocacy on behalf of abused, neglected, and abandoned immigrant children. In fiscal year 2024–2025, CHIRLA represented several dozen SIJS-eligible youth and filed approximately sixteen to twenty-one I-360 petitions. Since the fee-waiver ban took effect, CHIRLA has continued to file I-360 petitions on behalf of its SIJS-eligible clients, but doing so has required CHIRLA to divert staff time and organizational funds to cover the fee on behalf of those clients, as described further below.

13. Plaintiff Legal Services for Children ("LSC") is a nonprofit legal-services organization headquartered in San Francisco, California, within the Northern District of California, at 870 Market St., Suite 356, San Francisco, California 94102. LSC provides legal representation to children and youth in the San Francisco Bay Area, including children in foster care. LSC represents abused, neglected, and abandoned immigrant children seeking SIJS protection and other forms of humanitarian relief. LSC represents SIJS-eligible youth in state probate courts to obtain predicate orders and prepares and files Form I-360 petitions with USCIS. LSC receives funding from the California Department of Social Services Youth Legal Services ("CDSS YLS") program, which

5

requires LSC to open at least ten cases per fiscal year and to file at least one form of relief per case, which includes SIJS applications.

14.    All or nearly all of LSC's SIJS clients are indigent and lack the ability to pay the $250 fee imposed by § 1805. Because no fee waiver is available, LSC has been forced to pay the $250 SIJS filing fee from its own organizational funds on behalf of its clients. LSC estimates that at least ninety-five percent, and as many as one hundred percent, of its SIJS clients would be eligible for a fee waiver if one were available under existing fee-waiver criteria.

15.    Defendant Markwayne Mullin is the Secretary of the U.S. Department of Homeland Security and is sued in his official capacity. Secretary Mullin was confirmed by the United States Senate on March 23, 2026. He is responsible for the administration and enforcement of the immigration laws, including the SIJS program and the fee-waiver policies at issue.

16.    Defendant Joseph B. Edlow is the Director of U.S. Citizenship and Immigration Services and is sued in his official capacity. Director Edlow was confirmed by the United States Senate on July 15, 2025. He is responsible for adjudicating SIJS petitions and for implementing the fee and fee-waiver policies challenged herein.

17.    Defendant U.S. Department of Homeland Security ("DHS") is the federal agency charged with administering SIJS and is an "agency" within the meaning of 5 U.S.C. § 551(1).

18.    Defendant U.S. Citizenship and Immigration Services ("USCIS") is the component of DHS responsible for processing SIJS petitions (Form I-360), setting and collecting fees, and adjudicating fee-waiver requests. USCIS promulgated and enforces the challenged fee-waiver ban.

## STATUTORY AND REGULATORY BACKGROUND

**A.    *The SIJS Statute***

19.    Congress created SIJS in 1990 as part of the Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978, 5009–10 (codified as amended at 8 U.S.C. § 1101(a)(27)(J)). The statute was enacted for an expressly humanitarian purpose: to protect children in the United States who have been abused, neglected, or abandoned by one or both parents and who cannot safely return to their home countries.

///

6

20. To qualify for SIJS classification, a child must obtain a state-court order containing findings that: (1) the child has been declared dependent on a juvenile court, or committed to or placed under the custody of a state agency, department, or individual; (2) reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under state law; and (3) it would not be in the child's best interest to be returned to the child's or parent's country of nationality or last habitual residence. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

21. Once the state-court predicate order is obtained, the child files Form I-360 (Petition for Amerasian, Widow(er), or Special Immigrant) with USCIS. 8 C.F.R. § 204.11(d)(1); 90 Fed. Reg. at 34,514. Approval of the I-360 grants SIJS classification, which permits the child to seek adjustment of status to that of a lawful permanent resident under 8 U.S.C. § 1255(h), subject to visa availability and other statutory requirements.

22. SIJS eligibility is filing-deadline sensitive. A petitioner must be under twenty-one years of age and unmarried at the time of filing. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(b)(4), (c). The petitioner must also have obtained a qualifying state-court order satisfying the statutory criteria. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(b)(1). For children approaching their twenty-first birthday, any delay in filing can permanently extinguish SIJS eligibility. There is no mechanism to cure a failure to file the SIJS petition before the petitioner turns twenty-one.

23. Congress has amended the SIJS statutory framework on multiple occasions since its enactment. In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act narrowed eligibility by requiring children to be both declared court dependents and deemed eligible for long-term foster care. Pub. L. No. 104-208, div. C, § 384, 110 Stat. 3009-546, 3009-653. In 2008, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) on a broad bipartisan basis after carefully considering ways to protect immigrant children from human trafficking and other exploitation. The TVPRA broadened SIJS eligibility by eliminating the long-term foster-care requirement and clarifying that a child is eligible as long as reunification with at least one parent is not viable due to abuse, neglect, or abandonment. Pub. L. No. 110-457, § 235(d), 122 Stat. 5044, 5079–80. The TVPRA also broadened the exemption of approved SIJS petitioners from grounds of inadmissibility, clearing the path for their adjustment to

7

lawful permanent residence. Pursuant to the TVPRA, USCIS is required to make a decision on a properly filed petition for SIJS within 180 days of receipt. 8 C.F.R. § 204.11(g). Each time Congress revisited the SIJS statutory framework, it amended discrete elements while otherwise leaving the surrounding statutory and regulatory structure intact, including DHS's fee-waiver authority.

24.    Before H.R. 1, there was no filing fee for Form I-360 SIJS petitions. USCIS processed tens of thousands of SIJS petitions without charge, consistent with the humanitarian purpose of the statute and the documented indigence and vulnerability to exploitation of the applicant population.

**B.    *The Fee-Waiver Framework***

25.    DHS and its predecessor agencies have for decades waived fees for immigration-benefit requests. *See Ayuda*, 661 F. Supp. at 35 (noting that a longstanding Immigration and Naturalization Service regulation, 8 C.F.R. § 103.7(c)(1) (1986), "excuse[d] the requirement to pay in the event the alien certifies inability to pay").

26.    In addition, 8 C.F.R. § 106.3(b)(1) categorically exempts persons seeking or granted SIJ classification from fees for numerous related forms, including Form I-485 (adjustment of status), Form I-765 (employment authorization), and Form I-601 (waiver of inadmissibility). Because there was no fee for an SIJ petition before H.R. 1, USCIS had no occasion to include that fee among the fees eligible for waiver under 8 C.F.R. § 106.3(a)(3). Now that 8 U.S.C. § 1805 requires a fee to file the petition, the text, history, and structure of H.R. 1 foreclose Defendants' categorical refusal to make a waiver available. Congress's direction that USCIS "require the payment of a fee" does not preclude a waiver mechanism. USCIS's treatment of materially similar statutory language elsewhere in the Immigration and Nationality Act confirms that point: 8 U.S.C. § 1455 likewise requires the collection of naturalization fees, yet USCIS makes the naturalization-application fee waiver-eligible under 8 C.F.R. § 106.3(a)(3). Nothing in the text of § 1805 supplies a basis for treating the SIJ fee differently.

**C.    *Section 1805***

27.    On July 4, 2025, Congress enacted the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72. Title X, Subtitle A, Part I of the OBBBA (Sections 100001 through 100018) established a series of new immigration-related fees, codified at 8 U.S.C. §§ 1801–1815.

28.    Section 100005, codified at 8 U.S.C. § 1805, provides in relevant part:

> (a) In general.—In addition to any other fee authorized by law, the Secretary of Homeland Security shall require the payment of a fee, equal to the amount specified in this section, by any alien, parent, or legal guardian of an alien applying for special immigrant juvenile status under section 101(a)(27)(J) [of the Immigration and Nationality Act] (8 U.S.C. 1101(a)(27)(J)).

29.    Section 1805 further specifies that the fee amount for fiscal year 2025 shall be the greater of $250 or such amount as the Secretary may establish by rule, provides for annual Consumer Price Index adjustments, and directs that all fees collected shall be deposited into the general fund of the Treasury. 8 U.S.C. § 1805(b)–(d).

30.    Section 1805 contains no provision prohibiting or restricting fee waivers. *See* § 1805. It does not state that fees "may not be waived or reduced." It does not state that "no waiver" is available. And it does not contain a "notwithstanding any other provision of law" clause that would override existing authority to waive fees.

**D.    *Neighboring Provisions Expressly Prohibit Fee Waivers***

31.    In stark contrast to SIJS's § 100005, Congress included express no-waiver provisions in numerous other immigration-fee sections enacted in the same legislation. Every one of these provisions, like § 100005, uses the mandatory formulation "the Secretary of Homeland Security shall require the payment of a fee." If that alone were sufficient to make those fees non-waivable, then additional language expressly prohibiting waivers would be surplusage. Yet Congress added separate and explicit no-waiver language to numerous other fee provisions, instructing as to each such fee that "[f]ees required to be paid under this section shall not be waived or reduced":

        a.    8 U.S.C. § 1802(e) / OBBBA § 100002(e) (asylum application fee).

        b.    8 U.S.C. § 1803(a)(5) / OBBBA § 100003(a)(5) (initial asylum employment authorization document fee).

        c.    8 U.S.C. § 1803(b)(5) / OBBBA § 100003(b)(5) (initial parolee employment authorization document fee).

        d.    8 U.S.C. § 1803(c)(5) / OBBBA § 100003(c)(5) (initial TPS employment authorization document fee).

9

e.    8 U.S.C. § 1804(f) / OBBBA § 100004(f) (immigration parole fee).

f.    8 U.S.C. § 1806(a)(5) / OBBBA § 100007(a)(5) (visa integrity fee).

g.    8 U.S.C. § 1807(d) / OBBBA § 100008(d) (Form I-94 fee).

h.    8 U.S.C. § 1808(d) / OBBBA § 100009(d) (annual asylum fee).

i.    8 U.S.C. § 1809(d) / OBBBA § 100010(d) (parolee EAD renewal fee).

j.    8 U.S.C. § 1810(d) / OBBBA § 100011(d) (asylum EAD renewal fee).

k.    8 U.S.C. § 1811(d) / OBBBA § 100012(d) (TPS EAD renewal fee).

32.    Section 1805 sits in the middle of Chapter 16 of Title 8 without any comparable no-waiver provision. Consistent with the canon against surplusage and the *expressio unius est exclusio alterius* (roughly, "the express mention of one thing is the exclusion of another") rule of statutory construction, Congress's repeated inclusion of no-waiver provisions in neighboring sections and simultaneous omission of any such provision from Section 1805 must be interpreted to reflect a legislative choice that fee waivers are available for SIJS petitioners. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

E.    *Relevant Legislative History*

33.    The legislative record confirms that the omission of a no-waiver clause from § 1805 was deliberate. As introduced and passed by the House of Representatives, the SIJS fee provision, then numbered § 70005, included an express no-waiver subsection providing: "(e) NO WAIVER.— A fee imposed under this section shall not be waived or reduced." H.R. 1, 119th Cong. § 70005(e) (as passed by House, May 22, 2025); *see also* H. Comm. on the Judiciary, 119th Cong., Committee Print: Providing for Reconciliation Pursuant to H. Con. Res. 14, the Concurrent Resolution on the Budget for Fiscal Year 2025, at 13–14 (Comm. Print Apr. 27, 2025) (same); H.R. Rep. No. 119-

106, bk. 1, at 810–12 (2025) (same).

34.     The Senate amendment that became law removed the House's SIJS no-waiver clause. *Compare* H.R. 1, 119th Cong. § 70005(e) (as passed by House, May 22, 2025), *with* H.R. 1, 119th Cong. § 100005(a)-(d) (as passed by Senate, July 1, 2025). The Senate version retained express no-waiver clauses for numerous neighboring fee provisions while omitting the clause for SIJS. Congress then enacted the Senate version without the House's SIJS no-waiver clause. Pub. L. No. 119-21, § 100005, 139 Stat. at 368–69 (2025). Plaintiffs' textual argument does not depend on legislative history, but the legislative record confirms what the statutory structure already demonstrates: Congress considered and rejected a fee-waiver prohibition for SIJS.

**F.     *The Challenged Agency Action***

35.     On July 22, 2025, USCIS published the Fee Notice. *See* 90 Fed. Reg. 34,511. Table 1 of the Fee Notice designated the $250 SIJS fee as having "No Fee Waiver Available." *Id.* at 34,513.

36.     The Fee Notice cites "the new specific language in HR-1 stat[ing] that [certain] fees 'shall not be waived or reduced'" as the basis for interpreting H.R. 1 to impose non-waivable fees. *Id.* at 34,516. The Fee Notice acknowledges that "Sec. 100005 establishing the SIJ fee does not include an explicit 'no fee waiver' provision." *Id*. at 34,513 n.17. Despite expressly conceding the lack of a "'no fee waiver' provision," the Fee Notice concludes that the general instruction that the Secretary of Homeland Security "shall require the payment of a fee" for a SIJS petition overrides the Secretary's discretionary fee-waiver authority. *Id.* The body text likewise asserts that "[t]he language of HR-1 prohibits fee waivers or exemptions for this fee" but it, too, cites only the "shall require the payment of a fee" language. *Id.* at 34,515 & n.19.

37.     USCIS subsequently updated its Form I-912 webpage to state: "We cannot waive any fees required by H.R.-1." *I-912, Request for Fee Waiver (Form I-912)*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/i-912 (last visited July 20, 2026). This blanket statement treats all H.R. 1 fees identically, notwithstanding the material textual differences between Section 100005, which lacks a no-waiver provision, and the numerous sections that contain one.

38.     On April 29, 2026, DHS published an interim final rule, USCIS Immigration Fees and Related Procedures Required by H.R.1 Reconciliation Bill, addressing several H.R. 1 fees but not

11

the SIJS fee. *See* 91 Fed. Reg. 22,952 (Apr. 29, 2026) (effective May 29, 2026). DHS reiterated its position that "Fees imposed by HR-1 cannot be waived or reduced." *Id.* at 22,962. DHS reasoned that H.R. 1 superseded INA § 245(l)(7)'s fee-waiver-request requirement and that, because DHS left 8 C.F.R. § 106.3 unchanged, H.R. 1 fees are not among the fees that may be waived. *Id.* at 22,962.

39.     Defendants did not promulgate the categorical fee-waiver ban for SIJS petitions through notice-and-comment rulemaking under 5 U.S.C. § 553. The ban was announced through the Fee Notice, a sub-regulatory document, without prior public notice, opportunity for comment, or a statement of basis and purpose.

## FACTUAL ALLEGATIONS

### A.     *The SIJS Population Is Overwhelmingly Indigent*

40.     The population served by SIJS is, by statutory definition, among the most vulnerable in the immigration system. SIJS-eligible children have been found by a state court to have been abused, neglected, or abandoned by one or both parents. Many have fled violence, exploitation, or extreme poverty in their countries of origin. Most arrive in the United States without family support, financial resources, or any means of earning income.

41.     SIJS-eligible children are predominantly minors who cannot legally work in the United States and who depend on nonprofit organizations, pro bono attorneys, guardians, or foster families for even basic necessities. Many are unaccompanied children as defined by 6 U.S.C. § 279(g)(2).

42.     The $250 fee represents an insurmountable barrier to applying for SIJS for many of these children. They cannot earn the money to pay it, they have no parents or guardians with the means to pay it, and the nonprofit organizations that serve them operate on limited budgets that cannot absorb hundreds of additional fee payments.

### B.     *Harm to SIJS-Eligible Youth*

43.     The categorical fee-waiver ban harms every SIJS-eligible child who cannot pay the $250 fee. Every day a child remains unable to file Form I-360 because they do not have the money is a day spent without the protections SIJS makes available: the ability to seek deferred action

12

protection from removal, the path to work authorization that deferred action provides, and the security of a pending claim to lawful status.

44.    For SIJS-eligible youth close to turning twenty-one, the fee-waiver ban may not only delay access to SIJS protection; it may permanently extinguish it. A petitioner must be under twenty-one at the time Form I-360 is filed and must have a qualifying juvenile court order. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(b)(1), (4). For children approaching their twenty-first birthday, a categorical fee-waiver ban can permanently prevent filing before the statutory deadline. There is no mechanism to cure a failure to file the SIJS petition before the petitioner turns twenty-one. Once a child ages out, the loss is irrevocable.

45.    Children who lose SIJS eligibility may face devastating and irreversible consequences, including: arrest and detention by ICE; deportation to countries where they have no family support; exposure to the same conditions of abuse, violence, or exploitation that precipitated their flight; loss of access to education, healthcare, and stable housing in the United States; and severe psychological trauma.

46.    Each day the fee-waiver ban remains in effect, SIJS-eligible children across the country are denied protections to which they are entitled, and some of them permanently lose their eligibility. The harm is irreparable because no damages remedy exists against the United States for the loss of immigration status, and no amount of money can restore a child's eligibility once the statutory deadline passes.

**HARM TO PLAINTIFFS AND THEIR CLIENTS AND MEMBERS**

47.    LSC and CHIRLA assert organizational standing based on the fee-waiver ban's interference with their core activities, as alleged below. CHIRLA also asserts associational standing on behalf of its members, as alleged further below.

**A.    *LSC and CHIRLA Have Organizational Standing***

48.    An organization has standing to sue on its own behalf where a defendant's conduct has "directly affected and interfered with" the organization's pre-existing "core business activities." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–95 (2024) (cleaned up). Such injury exists where the challenged conduct "perceptibly impaired" the organization's ability to provide its

13

services, caused "concrete and demonstrable injury to the organization's activities," and imposed a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765–66 (9th Cir. 2018) (organizations may establish standing by showing that challenged practices "perceptibly impaired [their] ability to provide the services [they were] formed to provide" and caused a "diversion of resources" independent of litigation expenses). Such diversions must be operational responses compelled by the defendant's conduct, not voluntary advocacy choices or litigation expenses; an organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *The Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025) (cleaned up).

49.    The categorical SIJS fee-waiver ban, under which USCIS will not accept a SIJS petition without the $250 filing fee and will not accept or adjudicate a fee-waiver request for that fee, directly interferes with Plaintiffs' core legal-services activities and missions. LSC and CHIRLA provide no-cost immigration legal services to children and youth, including SIJS-eligible individuals. Success in accomplishing their missions is measured in significant part by the degree of Plaintiffs' success in obtaining SIJS protection for SIJS-eligible individuals. Like the SIJS-eligible population writ large, all or nearly all of Plaintiffs' SIJS clients and members are indigent and lack the ability to pay the $250 fee imposed by § 1805. By dramatically reducing the population of youth able to pursue SIJS protection for which they are otherwise eligible, USCIS's ban on waiving the SIJS petition fee directly impairs Plaintiffs' pursuit of their mission.

50.    Additionally, the SIJS fee-waiver ban directly and fundamentally frustrates LSC's and CHIRLA's missions by imposing a $250 cost on every SIJS filing that their indigent clients cannot pay and that USCIS will not even consider waiving no matter how dire the need. The ban mechanically prevents LSC and CHIRLA from performing the legal-services function that is central to their organizational purposes without first absorbing the $250 fee from their own funds or diverting staff time to overcome the fee barrier.

51.    The ban also forces Plaintiffs to divert scarce resources in order to enable their clients to navigate the fee process and overcome their indigency. This diversion of resources occurs in at

14

least one of two ways. Plaintiffs either are forced to spend staff time screening SIJS clients for ability to pay, counseling clients about the fee, collecting financial account information, and doing time-consuming follow-up with each client to ensure there are adequate funds in the client's account on the date when USCIS charges the account (lest the application be rejected). Or, to avoid expending all of that staff time, Plaintiffs must expend their own limited funds to pay SIJS filing fees. Furthermore, they must raise those funds or reallocate them from other organizational needs, such as staffing.

52.    All or nearly all of LSC's SIJS clients are indigent and lack the ability to pay the $250 fee. Because no fee waiver is available, LSC has been forced to pay the $250 SIJS filing fee from its own organizational funds on behalf of its clients. LSC estimates that at least ninety-five percent, and as many as one hundred percent, of its SIJS clients would be eligible for a fee waiver if one were available under existing fee-waiver criteria at 8 C.F.R. § 106.3. Before the fee-waiver ban, there was no SIJS filing fee at all; LSC filed I-360 petitions without charge. The $250-per-client expenditure is a concrete, forced diversion of organizational resources that would not exist but for Defendants' categorical ban. These expenditures are independent of the costs of this litigation.

53.    To pursue its core work, LSC receives California Department of Social Services Youth Legal Services funding requiring LSC to open at least ten cases per fiscal year and to file at least one form of relief per case. The $250-per-case fee burden requires LSC to expend organizational funds on filing fees. Since July 22, 2025, LSC has filed 21 SIJS petitions and has spent $5,250 paying the $250 fee for each one. LSC has covered the substantial majority of these fees using general, unrestricted funds—funds that LSC also needs to support its programs serving foster children, children seeking guardianship, and students needing education representation. LSC has not yet turned away or delayed any SIJS case because of the fee burden, but LSC anticipates that if it continues filing and covering fees at the current rate, it will be financially required to turn away SIJS-eligible youth. LSC's Development Team has been forced to divert time from its ordinary work to seek support from funders to cover these fees and to attempt to obtain reimbursement for them. For its fiscal year beginning July 2026, LSC adopted a deficit budget— anticipating that it will spend more than it raises, in part because of these filing fees—and expects

15

that if it cannot raise additional funds to cover them, it will need to draw on its financial reserves to do so.

54. LSC filed forty-three SIJS petitions in fiscal year 2024-2025. If the SIJS petition fee had been in effect and non-waivable, it would have cost LSC nearly $11,000 to cover the fee for its indigent client population. To date in fiscal year 2025-2026, LSC has paid $5,250—covering twenty-one petitions filed since July 22, 2025—in SIJS petition fees for its indigent clients. LSC management has expended time planning how to raise the money to cover LSC clients' SIJS petitions and has taken on the work of reaching out to institutional funders to help offset the costs. For SIJS cases that LSC places with law firms offering pro bono assistance, LSC also has had to ask the firms if they will cover the fee. Each of these diversions carries opportunity costs: LSC has less time to develop funding for staff and core legal-services work, and asking pro bono firms to cover filing fees limits the other requests LSC can make of those firms.

55. CHIRLA's core mission is to achieve a just society fully inclusive of immigrants, including by providing legal services to immigrant communities across California. CHIRLA's legal services encompass SIJS petitions as a regular practice area. CHIRLA serves SIJS-eligible youth through direct legal representation in state juvenile and family courts to obtain predicate orders, preparation and filing of Form I-360 petitions with USCIS, and advocacy on behalf of abused, neglected, and abandoned immigrant children. CHIRLA has more than ten current clients who have had difficulty paying the fee, and there are several dozen additional clients who are prospective SIJS applicants for whom the non-waivable fee will be a burden. In addition to its direct services work on behalf of SIJS-eligible children, CHIRLA served as co-counsel in *Casa Libre/Freedom House v. Mayorkas*, No. 2:22-cv-01510-ODW-JPR (C.D. Cal.), a class action that successfully challenged USCIS's delays in adjudicating SIJS petitions.

56. The fee-waiver ban has caused CHIRLA to divert substantial organizational resources from its core legal-services activities. Since the ban took effect, CHIRLA has redirected staff time and budget to, among other things: (a) fundraising to raise the $250 fee per child; (b) individual financial screening and triage; and (c) direct client-assistance expenditures from program funds to cover government filing fees on clients' behalf, as illustrated by the examples below. To date,

16

CHIRLA has not turned away or delayed assistance to any prospective SIJS client solely because of the fee barrier, but doing so has required extraordinary efforts, including redirecting the time of CHIRLA's Director of the Legal Services Department and Managing Director, as described in the examples below, and this diversion of resources cannot be sustained indefinitely.

57. The following member-client examples illustrate CHIRLA's organizational injury. They show how the fee-waiver ban impairs CHIRLA's core SIJS legal-services work, forces CHIRLA to divert staff time and organizational funds, and creates recurring operational burdens when member-clients cannot access SIJS protection without a non-waivable filing fee.

58. CHIRLA Member AH has two children whose SIJ petitions were recently approved. In late 2025, she had to pay USCIS $500 in fees for the two SIJ petitions. Had a fee waiver been available, Member AH's children would have qualified based on their mother's low income, but USCIS's categorical ban on fee waivers for SIJS petitions foreclosed that option. Member AH struggled to raise the hundreds of dollars necessary to ensure that her children's SIJS petitions would be considered, having to take out a loan to pay the fees. She had to take out a second loan to repay the first, and she is still paying down one of those loans today. CHIRLA Member AH is currently on disability and is unsure when, or whether, she will be able to return to work. Member AH's two children are also formal CHIRLA members.

59. CHIRLA Member AL has two children who petitioned for SIJ in 2026. Her work permit had expired, and without the ability to work, she did not have an income that would enable her to pay $500. Had a fee waiver been available, Member AL's children would have qualified for one based on their mother's lack of income, but USCIS's categorical ban on fee waivers for SIJS petitions foreclosed that option, leaving her dependent on CHIRLA to cover the fee instead. Ultimately, CHIRLA was able to supply the $500 fee. Without CHIRLA's financial assistance, Member AL's children would not have been able to petition for SIJS protection. It took several months of internal processes to secure the funding, which translated to a several-month delay in Member AL being able to file her children's SIJS petitions. Because CHIRLA does not normally provide funding to pay this fee and does not have funding readily available for this purpose, staff and directors had to go beyond their ordinary processes to secure $500 to pay these fees. Member

17

AL's two children are also formal CHIRLA members.

60.    CHIRLA Member AM has three children who petitioned for SIJ status in 2026. She found it difficult to pay the $750 worth of fees. Had a fee waiver been available, Member AM's children would have qualified for one based on their mother's low income. She cleans houses for a living and was required to work additional shifts for two months before raising the funds necessary to pay the fees. Member AM's three children are also formal CHIRLA members.

61.    CHIRLA Member GO has two children who are also CHIRLA members. CHIRLA Member GO is currently in the process of obtaining a predicate SIJS order for those two children. She is unsure how she will raise $500 to pay the fees and move forward with the process. Currently, she is unemployed and, with a household income under 150 percent of the federal poverty line, she would qualify for a fee waiver under USCIS's fee-waiver regime. *See* 8 C.F.R. § 106.3(a)(1)(ii) (providing fee waivers for petitioners with household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing). She injured her arm about a month and a half ago and lost her job. She is now in the process of looking for other work. If her children receive SIJS predicate orders before she is able to secure employment, she plans to borrow the money to pay the filing fee so that she can file the petitions without delay. She does not know if anyone will lend her the money. CHIRLA's harm is ongoing and recurring, not confined to Members AH, AL, and AM's already-filed petitions: Member AH continues to repay the loans she took out to cover her children's fees; CHIRLA anticipates that Members AL and AM, along with the more than ten additional current clients and several dozen prospective clients described above, will face the same fee barrier again in connection with future SIJS-related filings for the same or other children; and CHIRLA Member GO illustrates that the categorical fee-waiver ban continues to threaten new members with the same injury going forward.

62.    These facts establish LSC's and CHIRLA's organizational standing. Defendants' categorical fee-waiver ban perceptibly impairs Plaintiffs' ability to provide the SIJS legal services they were formed to provide, forces Plaintiffs to divert staff time and organizational funds away from their ordinary work, and imposes concrete operational costs independent of this litigation. Those injuries are directly traceable to Defendants' categorical refusal to accept or adjudicate SIJS

18

fee-waiver requests and would be redressed by vacatur of the ban and an injunction requiring Defendants to accept and adjudicate fee-waiver requests under the ordinary fee-waiver framework.

**B.      *CHIRLA Has Associational Standing***

63.      To establish associational standing, an organization must show that (1) its members would otherwise have standing to sue in their own right, (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (holding that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").

64.      CHIRLA is a membership organization. An individual becomes a formal member by registering with CHIRLA and paying a membership fee of $25, $60, or $100, depending on the membership tier selected, or by having that fee waived by CHIRLA's membership department based on the individual's financial circumstances. The CHIRLA members and member-clients described in this Complaint, including CHIRLA Member GO and her children, were contacted by CHIRLA's membership department, informed of the benefits of membership, and invited to become members. They each completed CHIRLA's formal membership process and paid (or had waived) the applicable membership fee. Each CHIRLA member and member-client identified in this Complaint became a formal CHIRLA member before this action was filed. As used in this Complaint, a "member-client" is a CHIRLA member who is also receiving legal services from CHIRLA; the Complaint uses that term to identify individuals who satisfy both categories, and uses "member" alone where formal membership—rather than receipt of legal services—is the fact relevant to standing. See *Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 145 F.3d 1017, 1030-31 (9th Cir. 1998) (rejecting associational standing where the plaintiffs failed to show the injured clients were also formal members).

65.      CHIRLA has approximately 50,000 members statewide. CHIRLA members may attend member meetings and trainings, participate in CHIRLA's organizing campaigns and

19

advocacy work, and otherwise help shape CHIRLA's institutional priorities. CHIRLA has no minimum membership age. Because membership requires payment of a fee, it is typically a parent or guardian who registers and pays for a minor's membership, and CHIRLA's membership department is not aware of an instance of an unaccompanied minor independently seeking membership without a parent's or guardian's involvement. Where a parent or guardian who has been granted a dues waiver seeks to add a minor child to the same membership, CHIRLA extends that waiver to the child. Because the injured CHIRLA members and member-clients identified in this Complaint are formal CHIRLA members, CHIRLA need not rely on the "indicia of membership" test that applies to organizations lacking a traditional membership structure. *See Ledwidge v. Fed. Deposit Ins. Corp.*, No. 5:24-cv-08352-BLF, 2025 WL 3454837, at *3 (N.D. Cal. Dec. 1, 2025) (holding that, "where a purported association lacks a 'traditional membership structure,' courts still require 'indicia of membership,'" meaning "members or constituents that (1) elect leadership of the organization, (2) serve as part of that leadership, and (3) finance the organization's activities" (citing *Hunt*, 432 U.S. at 344-45)).

66. CHIRLA's members would have standing to sue in their own right, thus satisfying the first element of the *Hunt* test for associational standing. As alleged above, CHIRLA has formal members who are SIJS petitioners, parents or guardians of SIJS petitioners, or both, and who have been or will be injured by the categorical fee-waiver ban. These members and member-clients are indigent, would qualify for a fee waiver if one were available under 8 C.F.R. § 106.3, and have been forced either to pay unaffordable fees, incur debt, work additional hours, rely on CHIRLA to cover the fees, delay filing, or face the same imminent fee barrier in future SIJS filings. Members AH, AL, and AM and their children have already suffered concrete economic injuries, including unaffordable fee payments, debt, delayed filings, diversion of family resources, and the need to rely on CHIRLA to cover fees. Member GO's children face the same imminent injury because they are in the process of obtaining predicate SIJS orders, are indigent, are in removal proceedings, and will be unable to file SIJS petitions without paying $500 in non-waivable filing fees, borrowing money, or securing other funds. CHIRLA Member GO's two children are ages 12 and 17, with dates of birth of May 2, 2014, and August 24, 2008, respectively. CHIRLA Member GO and her children

20

are indigent: she is unemployed, her household income falls under 150 percent of the federal poverty line, and she would qualify for a fee waiver under 8 C.F.R. § 106.3(a)(1)(ii) if one were available. She injured her arm and lost her job about a month and a half ago and is now searching for other work. She does not know how she will raise the $500 in filing fees her children's SIJS petitions will require, and if her children receive their predicate orders before she secures employment, she plans to try to borrow the money so that she can file without delay—though she does not know whether anyone will lend it to her. And both children are at risk of removal: they are currently in removal proceedings and are not represented by counsel in those proceedings.

67.    And the injuries of these CHIRLA members are directly traceable to Defendants' categorical fee-waiver ban because USCIS will not accept SIJS petitions without the $250 fee and will not accept or adjudicate fee-waiver requests for that fee. Those injuries are redressable because vacatur of the categorical ban and injunctive relief requiring USCIS to accept and adjudicate fee-waiver requests would permit qualifying SIJS petitioners to seek fee waivers under USCIS's ordinary fee-waiver criteria rather than being categorically barred from doing so. CHIRLA's members would thus have standing to sue in their own right, satisfying element one of the *Hunt* test for associational standing.

68.    With respect to element two of the *Hunt* test, CHIRLA's members are harmed in a way that is germane to the organization's purpose of protecting vulnerable immigrant communities and ensuring access to immigration benefits. CHIRLA's SIJS-focused legal services—described above—are a core, dedicated program of the organization, and the interests CHIRLA seeks to protect through this litigation are therefore germane to its institutional purpose. *See Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1174 (9th Cir. 1990) (holding that an association's stated "institutional goals" to protect "a broad range of rights" for its members satisfy germaneness). This satisfies the second *Hunt* element.

69.    And with respect to the third element of the *Hunt* test, the relief requested— declaratory judgment and injunctive relief—does not require individualized participation by any member. The challenge is to a categorical agency policy that applies identically to all SIJS petitioners; no individualized facts are needed to resolve the legal question. Plaintiffs do not seek

21

damages on behalf of CHIRLA's members. This satisfies the third *Hunt* element.

70.    Because CHIRLA has alleged concrete injuries to specific formal members and member-clients, it need not publicly identify those members by name to establish associational standing. Where, as here, it is "relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury," an association need not "identify by name the member or members injured" to establish associational standing. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see also Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025) (holding that CHIRLA's members had standing to seek prospective injunctive relief because the district court found that CHIRLA "has members who reasonably fear being subject to the stop and arrest practices challenged in this case," and because the large scale of the association plaintiffs' membership "increases the threat of future harm to [the association plaintiffs'] members") (cleaned up).

## CLAIMS FOR RELIEF

## COUNT 1

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action**

71.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

72.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when it is not "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), including where the agency "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or failed to provide a reasoned explanation for disregarding facts and circumstances underlying a prior policy, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

73.    Defendants' categorical fee-waiver ban fails arbitrary and capricious review. Defendants' implementation of a categorical bar on SIJS petition fee waivers is arbitrary and

capricious, because Defendants did not reasonably consider or explain: (a) the humanitarian purpose of the SIJS statute, which was enacted specifically to protect abused, neglected, and abandoned children; (b) the documented and near-universal indigence of the SIJS-eligible population; (c) the irreparable and permanent harms of deportation and aging out that result from denying SIJS access to children who cannot pay; (d) the disparate treatment of SIJS fees as compared to the neighboring fee provisions that contain explicit no-waiver language; (e) less burdensome alternatives, such as the fee-waiver processes used for other immigration benefit requests; and (f) whether § 1805's silence on fee waivers left Defendants with discretion to apply the ordinary fee-waiver process rather than impose a categorical prohibition. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 26 (2020) (holding that agency action was arbitrary and capricious where the agency "failed to appreciate the full scope of [its] discretion"). Those omissions are "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, because the ban categorically excludes indigent children from even seeking fee-waiver consideration for a humanitarian benefit whose eligibility may be permanently lost when a child turns twenty-one or when the basis for state-court jurisdiction ends.

74.    Defendants' categorical fee-waiver ban is arbitrary and capricious, because the agency failed to engage in reasoned decision-making, failed to provide an adequate explanation for its action, and failed to consider important aspects of the problem. *State Farm*, 463 U.S. at 43. Defendants' ban on fee waivers for SIJS petitioners must be set aside as arbitrary and capricious and not in accordance with law.

### COUNT 2

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Agency Action Without Observance of Procedure Required by Law**

75.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

76.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA requires that, before adopting a legislative rule, an agency must publish notice of proposed rulemaking in the Federal Register, provide an opportunity for public comment, and publish a statement of basis and purpose. 5 U.S.C. § 553(b)-(c). Section 553(b)(A) exempts certain agency actions from notice-

23

and-comment requirements, including "interpretative rules," "general statements of policy," and "rules of agency organization, procedure, or practice." *Id.* § 553(b)(A).

77.     Defendants' categorical ban on fee waivers for SIJS petitions is a legislative rule, not an interpretive rule, policy statement, or procedural rule. An agency rule is legislative when it has the "force of law," including when, "in the absence of the rule, there would not be an adequate legislative basis for enforcement action" or when "the rule effectively amends a prior legislative rule." *See Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087–88 (9th Cir. 2003); *see also Erringer v. Thompson*, 371 F.3d 625, 630, 632 (9th Cir. 2004) (holding that a rule is legislative when "there is no legislative basis for enforcement action on third parties without the rule" or when the rule "effectively amends a prior legislative rule"). Here, the fee-waiver ban does not merely interpret existing law; instead, it creates the operative legal prohibition on SIJS fee waivers that § 1805 itself does not contain. Absent Defendants' policy, § 1805 would provide no basis for categorically rejecting SIJS fee-waiver requests. Nor is the ban a general statement of policy, because it binds USCIS intake and adjudication processes by directing that SIJS fee-waiver requests are categorically unavailable. And it is not merely procedural, because it changes the legal consequences of filing a SIJS petition by foreclosing fee-waiver consideration altogether.

78.     Because Defendants' categorical fee-waiver ban is a legislative rule, Defendants were required to promulgate it through notice-and-comment rulemaking. They did not do so. Defendants adopted and implemented this categorical ban through the Fee Notice without publishing a notice of proposed rulemaking, without providing interested persons an opportunity for public comment, and without issuing the statement of basis and purpose required for legislative rules. Defendants therefore adopted the categorical fee-waiver ban without observance of procedure required by law. The ban must be held unlawful and set aside under 5 U.S.C. § 706(2)(D).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.     Declare that Defendants' categorical ban on fee waivers for the fee imposed by 8 U.S.C. § 1805 violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D);

///

2.      Declare that 8 U.S.C. § 1805 does not prohibit fee waivers for the $250 SIJS petition fee, does not displace USCIS's generally applicable fee-waiver framework, including 8 C.F.R. § 106.3, and does not authorize Defendants to categorically reject or deny SIJS fee-waiver requests on the ground that § 1805 makes the SIJS fee non-waivable;

3.      Vacate and set aside Defendants' policy that fee waivers are categorically unavailable for the SIJS petition fee imposed by 8 U.S.C. § 1805, including by vacating the relevant portions of the Fee Notice, 90 Fed. Reg. 34,511 (July 22, 2025); the interim final rule, 91 Fed. Reg. 22,952 (Apr. 29, 2026); and any USCIS webpage, form instruction, policy manual provision, or other guidance stating, implementing, or enforcing the vacated policy;

4.      Issue preliminary injunctive relief and/or a stay under 5 U.S.C. § 705 barring Defendants from enforcing the categorical fee-waiver ban during the pendency of this action, and requiring Defendants to accept and adjudicate requests for waiver of the SIJS fee under USCIS's generally applicable fee-waiver framework, including the means-tested-benefit, income, and extreme-financial-hardship standards set forth in 8 C.F.R. § 106.3(a)(1);

5.      Issue permanent injunctive relief enjoining Defendants from categorically denying fee waivers for SIJS petitions based on the erroneous premise that 8 U.S.C. § 1805 forbids such waivers and requiring Defendants to accept and adjudicate requests for waiver of the SIJS fee under USCIS's generally applicable fee-waiver framework, including the means-tested-benefit, income, and extreme-financial-hardship standards set forth in 8 C.F.R. § 106.3(a)(1);

6.      Award Plaintiffs their costs and reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

7.      Grant such other and further relief as the Court deems just and proper.

Dated: July 22, 2026                    Respectfully submitted,

                                        SHOOK, HARDY & BACON L.L.P.

                                        By: /s/ Matthew G. Ball
                                            Matthew G. Ball
                                            Attorney for Plaintiffs
                                            COALITION FOR HUMANE
                                            IMMIGRANT RIGHTS and LEGAL
                                            SERVICES FOR CHILDREN

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA

By: */s/ Jacob Gonzalez*
      Jacob Gonzalez
      Attorney for Plaintiffs
      COALITION FOR HUMANE
      IMMIGRANT RIGHTS and LEGAL
      SERVICES FOR CHILDREN


COALITION FOR HUMANE IMMIGRANT
RIGHTS

      Carl Bergquist
      (*pro hac vice application pending*)
      Attorney for Plaintiff
      COALITION FOR HUMANE
      IMMIGRANT RIGHTS

26